IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY WINDOM | : | CIVIL ACTION |
| | : | |
| v. | : | No. 23-1240 |
| | : | |
| J. RIVELLO, et al. | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                                                             **March 31, 2025**

      Petitioner Roy Windom has filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his state-court convictions for rape of a child, unlawful contact with a minor, endangering the welfare of a child, and indecent assault of a person less than thirteen on the ground that he received ineffective assistance of counsel at trial. Windom alleges his trial counsel was constitutionally ineffective in two respects—first, for failing to object to Windom not being present when the trial court ruled on a jury question, and second, for not objecting to the prosecutor's misstatement of the evidence during closing argument. On May 28, 2024, the Honorable Carol Sandra Moore Wells issued a Report and Recommendation (R&R) concluding the state courts had reasonably rejected Windom's claims for relief and recommending the petition be denied on the merits, without an evidentiary hearing, and without issuance of a certificate of appealability. Windom objects to the R&R and also seeks to expand the record. Because the Court agrees Windom's claims lack merit, the Court will adopt the R&R and deny Windom's habeas petition. Windom's motions for expansion of the record will also be denied.

**BACKGROUND**

      Windom's convictions stem from his physical and sexual abuse of his younger sister, D.J., over a period of several years, while they both resided with their mother, T. Lyons. The abuse began when D.J. was nine years old and Windom was 24. In August 2014, D.J. disclosed some

aspects of the abuse to her father (with whom she was living at the time) and to healthcare providers at the Children's Hospital of Philadelphia. N.T. 6/5/19 at 53-54; Commw. Ex. 4 at 3, 9, ECF No. 34-1 at 120, 126. The case was referred to the authorities, and D.J. was eventually interviewed by a social worker with the Philadelphia Children's Alliance (PCA) on October 29, 2014, a week after her father passed away, at which time she was again residing with her mother. N.T. 6/5/19 at 55; Commw. Ex. 3, ECF No. 34-1 at 108-16. During this initial interview, D.J. denied that Windom had touched her inappropriately and claimed her father had told her to lie. N.T. 6/5/19 at 56, 88-89; Commw. Ex. 3 at 8, ECF No. 34-1 at 115.

In 2015, D.J. was removed from her mother's home and placed in foster care. N.T. 6/5/19 at 51-52, 67. She was eventually sent to The Bridge, a residential behavioral health treatment program.[1] *Id.* at 51-52, 68; Commw. Ex 2 at 1, 3, ECF No. 34-1 at 100, 102. While at The Bridge, D.J. began disclosing details of Windom's sexual abuse of her to a therapist. N.T. 6/5/19 at 52; Commw. Ex. 2 at 3, ECF No. 34-1 at 102. On November 19, 2015, she returned to the PCA with her therapist and was interviewed a second time. Commw. Ex. 2, ECF No. 34-1 at 100-07; *see also* N.T. 6/5/19 at 101, 158. During the second interview, D.J. disclosed that Windom had sexually abused her on multiple occasions when she was between the ages of nine and thirteen, and disclosed additional details about the abuse. Commw. Ex. 2 at 7, ECF No. 34-1 at 106; *see also* N.T. 6/5/19 at 52-53. She also explained she had falsely denied the abuse in the previous interview because she was not ready to disclose it at the time. Commw. Ex. 2 at 7, ECF No. 34-1 at 106. After the interview, the case was investigated by the Philadelphia Police Department's

---

[1] The Bridge is "a nonprofit behavioral health treatment and youth opportunity program for adolescents and their families seeking to overcome substance abuse, mental health issues, truancy and other challenges." *Commonwealth v. Windom*, No. 1942 EDA 2021, 2022 WL 2693469, at *7 n.10 (Pa. Super. Ct. July 11, 2022) (citation omitted).

2

Special Victims Unit (SVU). Windom was eventually arrested in 2017 and charged with various offenses relating to the sexual abuse.

The case went to trial in June 2019, with jury selection on June 4. The next day, the jurors heard opening arguments and witness testimony. The Commonwealth presented four witnesses: D.J., Lyons, a PCA social worker, and the Philadelphia Police Department SVU officer who investigated the case. D.J. described Windom's sexual abuse of her, explaining that the abuse began after her grandmother died, providing details regarding what Windom did to her, and stating the abuse occurred on multiple occasions over a period of years. *See* N.T. 6/5/19 at 42-51. D.J. also testified about Windom's violence toward her and other members of the family, including her mother, stating Windom had threatened he would hurt her mother if D.J. told anyone about the abuse. *See id.* at 45. D.J. explained that when her mother brought her to the initial PCA interview in October 2014, she falsely denied the abused because she knew she would have to go back to her mother's house and was afraid of Windom. *See id.* at 54-55. Lyons also testified about Windom's violence, stating he would hit her, D.J., and other family members. *See id.* at 117-18. Carolina Castano, a forensic interviewer with the PCA, described the forensic interview process and explained it is not uncommon for children to disclose abuse gradually over time.[2] *See id.* at 155-61. The Commonwealth's final witness was Tyrone Green, an officer with the SVU's Child Abuse Subunit. Green described his role in the forensic interview process and stated delays in reporting are not unusual in child abuse cases. *See id.* 164-69.

Also on June 5, Windom testified in his own defense, denying the abuse and implying that D.J. had renewed her allegations in November 2015 at the behest of Lyons. On the latter point,

---

[2] Castano did not personally conduct the interview of D.J. on November 19, 2015. She explained the person who did conduct D.J.'s interview no longer worked at the PCA. N.T. 6/5/19 at 157-58.

3

Windom stated only that a dispute arose between himself and his mother on October 29, 2015,[3] and "[t]he result of that situation was in November 18th, 2015," the day before D.J.'s second PCA interview.[4]  N.T. 6/5/19 at 188-89.

On June 6, 2019, the defense rested without calling any additional witnesses.  After closing arguments and the judge's instructions, the jury left the courtroom just before noon to begin deliberating.  N.T. 6/6/19 at 80.  The deliberations continued the following morning (June 7) until the jury notified the court it had reached a verdict at 10:39 a.m.  ECF No. 34-1 at 63.  Before the jurors returned to the courtroom, the trial court made a statement on the record about two jury questions it had received:

> THE COURT:  Question No. 1:  Can we see the PFA[5] report No. 2 from November 15.
> And there was an agreement to tell them just to rely on their own recollection.
> Question No. 2:  We are close to reaching an agreement, but not all people are in agreement.
> And now we have a verdict.  They weren't told anything because they got a verdict while I was on the bench on another matter.

N.T. 6/7/19 at 4.

The jury then returned to the courtroom and reported its verdict, convicting Windom of rape of a child, unlawful contact with a minor, endangering the welfare of a child, and indecent

---

[3] Windom initially suggested his mother stole from him, stating "I was using my mom's address and my mom pretty much stole my money because I had my debit card --."  N.T. 6/5/19 at 187.  Before he could finish his statement, however, the prosecutor objected, and the trial court sustained the objection and instructed the jury to "disregard that last statement."  *Id.*

[4] Windom also stated that a couple of weeks after the dispute with his mother arose, she was terminated from her job, N.T. 6/5/19 at 188, but it is not clear whether Lyons's termination is the "result" that occurred on November 18, 2015.

[5] Although the trial court read the jury's handwritten note as requesting a *PFA* report, it is clear from the context—and the parties agree—the jury was requesting the November 2015 *PCA* report.

4

assault of a person less than thirteen, and acquitting him of the remaining charges.[6] *Id.* at 5-8. Windom was later sentenced to a total of 12½ to 25 years of imprisonment followed by 12 years of probation. N.T. 1/13/20 at 9. His judgment of sentence was affirmed on appeal.

Following the appeal, Windom filed a pro se petition for relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. §§ 9541-46. The PCRA court appointed counsel to represent Windom. After reviewing the record, however, counsel filed a "no merit" letter and requested leave to withdraw. ECF No. 34-1 at 316-38. Windom then filed an amended PCRA petition, which the PCRA court dismissed. The Superior Court affirmed, noting it was doing so "on the basis of the PCRA court's Opinion," which it attached to its decision. *Commonwealth v. Windom*, No. 1942 EDA 2021, 2022 WL 2693469, at *3 (Pa. Super. Ct. July 11, 2022).[7] The Pennsylvania Supreme Court denied allocatur.

In March 2023, Windom filed a pro se federal habeas petition raising two claims of ineffective assistance of counsel. ECF No. 1 at 8-10. Windom later sought and was granted leave to amend his habeas petition, but the amendment raised essentially the same two claims as his original petition. Windom asserted his trial counsel was ineffective for (1) failing to object that Windom was not present when the trial court ruled on the jury's first question—the request to see the November 2015 PCA report—on June 6, 2019, and (2) failing to object to the prosecutor's misstatement of the evidence during closing argument. *See* ECF No. 12.

---

[6] The jury acquitted Windom of rape by forcible compulsion, corruption of minors, and aggravated indecent assault of a child. N.T. 6/7/19 at 5-8.

[7] Because the Superior Court adopted the PCRA court's opinion, this Court reviews the PCRA opinion as the "last reasoned decision" of the state courts. *See Bond v. Beard*, 539 F.3d 256, 289 (3d Cir. 2008).

On May 28, 2024, the Honorable Carol Sandra Moore Wells issued an R&R recommending that relief be denied because the state courts addressed both claims on the merits and reasonably rejected them. In response to the R&R, Windom filed a motion for expansion of the record, and objections, which he has twice sought to amend.

**DISCUSSION**

In reviewing the R&R, this Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

As noted in the R&R, the state courts addressed both of Windom's ineffective assistance of counsel claims on the merits. Thus, under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may not grant habeas relief unless the state-court adjudication resulted in a decision that either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). State-court determinations of factual issues are "presumed to be correct," and the federal habeas petitioner bears the burden of rebutting this "presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Burt v. Titlow*, 571 U.S. 12, 18 (2013).

A state-court decision is "contrary to" clearly established Federal law if the state court either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the result reached by the Court]." *Bell v. Cone*, 543 U.S. 447,

6

452-53 (2005) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A decision involves an "unreasonable application" of clearly established Federal law "if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law"; hence, a federal habeas court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. Rather, relief is available only if "the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

Similarly, in determining whether a state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" within the meaning of § 2254(d)(2), the question is not whether the reviewing court "would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Rather, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The "clearly established Federal law" applicable to ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams*, 529 U.S. at 391. To prevail on a claim of ineffective assistance of counsel, a petitioner must show, first, "that counsel's performance was deficient," and second, "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The deficient performance prong requires the petitioner to demonstrate "that counsel's representation fell below an objective standard of reasonableness,"

measured under "prevailing professional norms." *Id.* at 688. To establish prejudice, the petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Windom's first claim is that his trial counsel was ineffective for failing to object to Windom's absence when the trial court ruled on the jury's June 6, 2019 question as to whether they could see the November 2015 PCA report.[8] Windom raised this claim in his PCRA petition, but the PCRA court rejected it. The PCRA court recognized that a criminal defendant has a right to be present at his trial under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments. *Windom*, 2022 WL 2693469, at *10. However, the PCRA court found the factual premise of the claim to be incorrect. *Id.* Specifically, the PCRA court—the same judge who presided over Windom's trial—found that while the jury had submitted two questions, one on the afternoon of June 6 and one on the morning of June 7, the court could not immediately rule on the questions because it was "sitting for an unrelated matter." *Id.* As a result, the questions were not presented to the court until later in the morning on June 7, by which time the jury had already reached a verdict. *Id.* Thus, while "the parties had 'agree[d] to tell [the jury] to rely on their own recollection'" in response to the question on June 6, the jury question was "never ruled upon, either within or outside of [Windom's] presence." *Id.* (quoting N.T. 6/7/19 at 4). Rather, Windom was present when the court "read the jury's question aloud in open court" on June 7. *Id.* Having found Windom's assertion that he was not present during the

---

[8] In his amended objections, Windom seeks to reframe this claim in terms of counsel's failure to object to Windom's absence "during the end of [his] June 6, 2019 trial." ECF No. 29 at 3; *see also* ECF No. 30 at 3. This recharacterization does not affect the Court's analysis.

jury question on June 6 to be meritless, the PCRA court found counsel was not ineffective for failing to object. *Id.* As noted, the Superior Court affirmed "on the basis of the PCRA court's Opinion." *Id.* at *3.

Addressing this claim in the R&R, the Magistrate Judge found the state court reasonably rejected Windom's underlying claim that he was not present during the jury question and thus reasonably applied *Strickland* in finding trial counsel was not ineffective. The Magistrate Judge rejected Windom's contention that the PCRA court's fact-finding regarding the jury question was incorrect, noting Windom failed to provide clear and convincing evidence to rebut the presumption of correctness and that the existing record supported rather than rebutted the state court's fact-finding. R&R 9, ECF No. 25.

Windom objects to the R&R's conclusion that the state court's fact-finding is supported by the record.[9] He argues the state court's factual determinations are contradicted on the existing record, faults the state court for failing to hold a hearing to resolve a conflict in the record, and moves to expand the record to include the transcript of the additional proceedings he believes were held on June 6, 2019.[10]

To the extent that Windom argues the state court's fact-finding is not entitled to deference because it did not hold a hearing on his PCRA petition, the law is otherwise. In his objections (ECF No. 28), Windom cites an earlier version of 28 U.S.C. § 2254(d), which "condition[ed]

---

[9] Windom initially objected to the R&R on June 17, 2024. ECF No. 28. He has since sought to amend his objections on three separate occasions. ECF Nos. 29, 30, 31. The Court has considered all of Windom's objections in reviewing this case.

[10] Windom included his motion for expansion of the record with his reply to Commonwealth's response to his habeas petition, *see* ECF No. 23 at 18-20; however, the motion was not docketed separately and was not addressed in the R&R.

federal deference to state court factual findings on whether the state court held a hearing." *Lambert v. Blackwell*, 387 F.3d 210, 238 (3d Cir. 2004). The statute was amended in 1996, however, with the passage of AEDPA. The current version of the statute "has no requirement that the state court hold a hearing or comply with other prerequisites to deference listed in the previous habeas statute." *Rolan v. Vaughn*, 445 F.3d 671, 679 (3d Cir. 2006). Thus, while "state fact-finding procedures may be relevant when deciding whether the determination was 'reasonable' or whether a petitioner has adequately rebutted a fact, . . . the procedures are not relevant in assessing whether deference applies to those facts." *Id.*

As to Windom's challenge to the state court's factual determinations, the state court record includes the jury's handwritten questions as well as the notes of testimony from trial. The notes of testimony for June 6, 2019 conclude just before noon, with the jurors exiting the courtroom to deliberate and the court dismissing the alternate jurors. N.T. 6/6/19 at 80-81. The first jury question is dated June 6, 2019[11] and asks, "Can we see PCA report #2 from Nov '15." ECF No. 34-1 at 61. Underneath the handwritten question is a notation, in different handwriting, which reads, "Please rely on your own recollection," followed by the time (3:43 p.m.) and the date (6/6/19). *Id.* The second jury question is dated June 7, 2019 at 10:15 a.m. and states, "We are close to reaching an agreement but not all people are in agreement." ECF No. 34-1 at 62. Unlike the first question, the second includes no additional handwritten annotation. A third jury note, dated June 7, 2019 at 10:39 a.m., reports "We have a verdict!" ECF No. 34-1 at 63. The notes of testimony for June 7 reflect that the jury returned to the courtroom at 11:05 a.m. to report the

---

[11] The time of the question is also handwritten on the document, but it is not clear whether the time recorded is "153" (i.e., 1:53 p.m.) or "1531" (i.e., 3:31 p.m.). ECF No. 34-1 at 61.

verdict.  N.T. 6/7/19 at 4-5.  As noted above, the notes of testimony begin just before the jury's return with the court's statement regarding the jury questions:

> THE COURT:  Question No. 1:  Can we see the P[C]A report No. 2 from November 15.
> And there was an agreement to tell them just to rely on their own recollection.
> Question No. 2:  We are close to reaching an agreement, but not all people are in agreement.
> And now we have a verdict.  They weren't told anything because they got a verdict while I was on the bench on another matter.

*Id.* at 4.

Windom does not contend he was absent from any of the transcribed proceedings on June 6 or 7, 2019.  Rather, he argues the handwritten notation on the June 6 jury question shows that question was received and answered on June 6.  ECF No. 28 at 3.  Windom posits that the trial court conducted proceedings regarding the first jury question on June 6, at which he was not present, and then placed the result of the proceeding on the record on June 7, noting the court's statement regarding the jury questions is vague as to whether the jury was not told anything in response to both questions or only the second question.  *Id.*  He argues that, at a minimum, there is a conflict in the record that state court should have resolved via an evidentiary hearing.[12]

---

[12] Windom also argues the state court docket supports his interpretation because it shows the jury question was docketed on June 6, 2019 and "the trial resumed afterwards."  ECF No. 23 at 3.  As Windom notes, the docket includes an entry on June 6, 2019 that reads "Question from Jury."  ECF No. 34 at 10.  Although the docket also includes a later entry the same day that reads "Trial Continued," *id.*, this entry appears to be an administrative matter, not an indication that the trial resumed after receipt of the jury note.  The docket includes various entries describing the specific trial proceedings that occurred each day—e.g., "Jury Selection Completed," "Jury Sworn," "Opening Statements," "Testimony Begins," "Prosecution Rests," "Testimony Begins," "Testimony Resumes," "Defense Rests," "Closing Arguments," "Jury Charged," "Jury Retires for Deliberation," etc.  *Id.* at 8-10.  In contrast, the "Trial Continued" docket entry is one in a series of docket entries—"Assignment of Judge," "Trial Continued," "Trial Scheduled," "Hearing Notice"—that appear on each day of the trial.  *See id.*  Notably, this same series of docket entries follows the entry "Jury Selection Completed" on June 4, 2019, even though there is no suggestion any further trial proceedings occurred that day.  *See id.* at 8.

11

The PCRA court determined that the jury questions were first presented to the trial court on June 7 and were never ruled upon, either in or outside of Windom's presence. While Windom's alternative reading of the record is plausible, "under § 2254(d)(2), it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (quoting *Brumfield*, 576 U.S. at 314). Windom cannot prevail because he has not shown these factual determinations—which, as noted, were made by the same judge who presided at trial—are objectively unreasonable on the existing record. The notation on the June 6 jury question "Please rely on your own recollection" is consistent with trial court's statement on the record on June 7 that, as to that question, "there was an agreement to tell [the jury] just to rely on their own recollection." N.T. 6/7/19 at 4. Although the date of notation suggests the parties' agreement may have been reached on June 6—and thus that question was disclosed to *counsel* that day—it does not contradict trial court's statement that *jurors* "weren't told anything because they got a verdict while I was on the bench on another matter." *Id.* On these facts, the PCRA court's findings are reasonable. Likewise, the presumption of correctness afforded these factual determinations is not rebutted by clear and convincing evidence on the existing record. *See* 28 U.S.C. § 2254(e)(1).

Windom also seeks to expand the record to include a transcript of the additional proceedings he believes were held on June 6, 2019, after the jury submitted its question.[13]  ECF

---

[13] In his original motion, Windom also identified various items from the state court record that were necessary to properly review his issues, including the PCA reports. Mot. Expansion 3, ECF No. 26. The state court record contains two PCA reports, one dated October 29, 2014 and the other dated November 19, 2015. Commw. Exs. 2 & 3, ECF No. 34-1 at 100-16. Although Windom also refers to a PCA report from October 29, 2015, there is no such report, as the record reflects that D.J. had only two interviews at PCA. *See, e.g.*, N.T. 6/5/19 at 101 (D.J. stating her mother took her to PCA in 2014, not in October of 2015); *id.* at 158-60 (stating dates of D.J.'s PCA interviews are October 29, 2014 and November 19, 2015). While the November 19, 2015

No. 26 at 2; ECF No. 27 at 2. This Court has obtained the state court record in Windom's underlying criminal case from the Court of Common Pleas, including the trial transcripts. *See* ECF Nos. 33-35. As noted, however, the transcript for June 6, 2019 concludes just before noon that day, and the next transcript does not begin until around 11 a.m. the following day. There is no existing transcript for the afternoon of June 6, 2019. And while Windom urges the Court to determine whether an audio or video recording of further proceedings on June 6 exits, there is no reason to believe any such proceedings were held based on the PCRA court's finding that the question was not presented to the trial court until the following day.

Moreover, no purpose would be served in granting Windom's motion for expansion because even if he could show that the trial court responded to the jury's question on June 6, 2019, and that defense counsel was ineffective for failing to object to his not being present, Windom has not shown he was prejudiced by the error. Even assuming that had Windom been present when the trial court addressed the jury question, the court would have allowed the November 19, 2015 PCA report to go to the jury, Windom cannot show a reasonable probability the outcome of the trial would have been different.

The report as a whole was damaging to Windom. It reflects that at the time of the interview, D.J. was "inpatient at The Bridge," where she had resided since June 2015. Commw. Ex. 2 at 3, ECF No. 34-1 at 102. D.J.'s therapist reported that D.J. had "started disclosing about the current allegations [of sexual abuse] approximately a month ago and recently ha[d] started becoming more descriptive." *Id.* Her case manager also reported D.J. had disclosed her previous "ongoing psychical abuse and sexual abuse by [Windom]." *Id.* The interview portion of the report includes

---

report at times refers to D.J.'s earlier interview as having occurred on October 29, *2015*, it is clear these references concern her October 29, *2014* interview.

the details D.J. disclosed about Windom's sexual abuse of her between the ages of 9 and 13, as well as the interviewer's forensic impression that D.J.'s statement was consistent with what her therapist and case manager said D.J. told them. *Id.* at 7, ECF No. 34-1 at 106. In the interview, D.J. explained she had lied during her previous forensic interview because "her mom tricked her into coming in and she was not ready to disclose," and stated she initially did not want to disclose the abuse because she did not want her brother to go to jail. *Id.*

The report also includes information about Windom's prior criminal history and about D.J.'s family history, including her "long history" with the Department of Human Services and her history of "family violence, chaos and destruction." *Id.* at 2, 4, ECF No. 34-1 at 101, 103. Her case manager reported D.J. had seen her mother "for the first time in a long time yesterday (11/18/15)" and had stated Windom "had been sending mom multiple messages." *Id.* The report also states D.J. "was upset and knows that [Windom] used to provide for mom" and felt "guilty that she and her siblings were removed from the home due to [D.J.'s] original disclosure of psychical abuse by [Windom]." *Id.*

Windom's theory is that the failure to provide the report to the jury was prejudicial because it would have corroborated his attempted testimony that Lyons made D.J. lie because Lyons "had stolen money from [Windom] on October 28th, or 29th of 2015, which was resolved on November 18th 2015." ECF No. 12 at 2. The Court disagrees. The "motive" theory Windom claims the report would support was not developed at trial beyond his own vague testimony that "in October of 2015 some dispute happen[ed] between [him] and [his] mom" and "there was a result of that" on November 18, 2015, possibly involving his mother being terminated from her job. N.T. 6/5/19 at 188. Although both Lyons and D.J. testified, neither was asked about the unspecified "dispute" between Lyons and Windom—or about the meeting between Lyons and D.J. on November 18,

14

2015—and defense counsel did not even mention the retaliatory motive theory in his closing argument. *See* N.T. 6/6/19 at 6-33. While the report references that D.J. saw her mother "for the first time in a long time" the day before the PCA interview, it gives no indication as to whether they discussed the abuse or D.J.'s decision to report it. Most importantly, the report indicates that D.J. had begun disclosing Windom's sexual abuse of her to her therapist a month before the interview, refuting Windom's suggestion that D.J. fabricated the allegations in response to something Lyons said on November 18. Even assuming that the jury's request for the November 2015 PCA report was addressed and resolved outside Windom's presence, there is no reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different. Windom's first claim lacks merit for this reason as well. *See Bryant v. United States*, No. 15-2158, 2016 WL 2930872, at *12 (C.D. Ill. May 19, 2016) (rejecting ineffective assistance of counsel claim based on attorney's failure to object to the judge addressing a jury question outside the defendant's presence where the defendant failed to show "a reasonable probability that the result of his trial would have been different but for his attorneys' alleged error").

Windom's second claim is that trial counsel was ineffective for failing to object to prosecutorial misconduct during closing argument. Specifically, Windom argues the prosecutor misstated the evidence by suggesting D.J. had no contact with her mother before her November 19, 2015 PCA interview. *See* ECF No. 15 at 28. The PCRA court rejected the claim, finding the prosecutor's "closing remarks were derived directly from the evidence presented at trial" and "were a perfectly fair rebuttal to [Windom's] testimony," such that "trial counsel had no reasonable basis on which to lodge an objection." *Windom*, 2022 WL 2693469, at *9-10. Addressing this claim in the R&R, the Magistrate Judge found the state court "reasonably concluded that the

15

remarks at [Windom's] trial did not violate due process" and thus reasonably rejected the claim. R&R 11, ECF No. 25.

Although prosecutorial misconduct can give rise to a due process violation, the Supreme Court has set a high bar for such claims. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In evaluating a claim of prosecutorial misconduct, the reviewing court "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Rolan v. Coleman*, 680 F.3d 311, 321 (3d Cir. 2012) (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)). While prosecutors may not misstate evidence, they are entitled to "argue reasonable inferences from the evidence." *United States v. Fulton*, 837 F.3d 281, 306 (3d Cir. 2016) (citation omitted). Thus, no due process violation occurs where "the alleged misstatements were either supported by other statements in the record or acceptable arguments based on the trial testimony and the defense arguments." *Rolan*, 680 F.3d at 325.

Windom's claim of prosecutorial misconduct concerns the portion of the closing argument in which the prosecutor sought to rebut Windom's suggestion, during his testimony, that Lyons got D.J. to falsely report sexual abuse to get back at Windom for a dispute that resulted in her losing her job. The prosecutor addressed the issue first by noting that "through the defendant's testimony and through the argument there's been some allegations that the mom made it up to get back at Mr. Windom." N.T. 6/6/19 at 43. He then urged the jury to

16

> [r]emember where she was when she made that allegation, when she finally told her story. She was at [T]he Bridge, she didn't have contact with the mom. She's taken immediately to the Philadelphia Children's Alliance, and she tells what happened to her. There's no way that she's told what to say.

*Id.* Later, in urging the jury to find Windom not credible, the prosecutor suggested Windom had "shape[d]" his testimony after reviewing the evidence against him. *Id.* at 49-50. He continued:

> Now he tells you that there is something going on with . . . Lyons, and that's the reason this is up, right, that this is revenge, that . . . Lyons stole from him, something happened, it was getting resolved, and she's after him. He says it was resolved on the 18th of November, and all of a sudden when this has happened on the 19th of November, there's your timeline for you, right? Amazing because again remember . . . Lyons didn't have access to [D.J.], didn't find somehow on the 18th and say, hey, you better go make this report, let's get him in trouble. [D.J.] is in [T]he Bridge, away from the mom, in therapy. But he got to shape his story because he knows it was disclosed the 19th, and I'll come up with something on the 18th that gives a reason for it, no evidence of that besides his testimony.

*Id.* at 50-51. The prosecutor then pointed out that despite having vigorously cross-examined Lyons and D.J., defense counsel did not question either of them about Windom's retaliation theory. *See id.* at 51-52.

The PCRA court found the prosecutor's argument did not misstate the evidence because although the November 19, 2015 PCA report disclosed that D.J. had seen Lyons on November 18, 2015, it confirmed that D.J. had not seen her mother for "a long time" before the meeting and that she had begun disclosing Windom's sexual abuse to her therapist a month earlier. *Windom*, 2022 WL 2693469, at *9. While the report shows that D.J. had no contact with her mother before reporting Windom's abuse to her therapist sometime in October 2015, the prosecutor suggested she had no contact her mother before reporting the abuse to PCA on November 19, 2015. As noted, however, the report reflects that D.J. did have contact with her mother the day before her PCA interview.

17

This conflict calls into question the reasonableness of the state court's determination that Windom's trial counsel had no reasonable basis on which to object to the closing argument. The Court need not decide the issue, however, because even if trial's counsel's performance was deficient, Windom has not shown he was prejudiced by the error. As noted above, the retaliatory motive theory to which the misstatement related was addressed only briefly in Windom's direct examination, and his testimony on this issue was extremely vague. Although Windom alluded to a "dispute" between himself and his mother, the defense made no effort to establish that D.J. was aware of the dispute or that she saw her mother before her November 2015 PCA interview, and defense counsel did not even mention the theory in his closing argument. In seeking to rebut the theory, the prosecutor did not rely solely on Lyons's lack of access to D.J. while she was at The Bridge but also noted defense counsel's failure to ask Lyons or D.J. anything about the dispute on cross examination. Viewed in context and in light of the entire trial, any misstatement certainly did not rise to the level of a due process violation and would not have been a basis for a mistrial. There is also no reasonable probability that, had counsel objected, leading the trial court to strike certain of the prosecutor's remarks, the result of the trial would have been different. Windom is therefore not entitled to relief on this claim.

Upon de novo review of Windom's objections to the R&R, the Court agrees both of Windom's claims lack merit. Accordingly, Windom's objections will be overruled, the R&R will be approved, and Windom's habeas petition will be denied without an evidentiary hearing. Windom's motions for expansion of the record will also be denied. Because Windom has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability.

An appropriate order follows.

BY THE COURT:


<u>/s/ Juan R. Sánchez</u>
Juan R. Sánchez, J.